UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>24-mj-6136-PAB</u>

IN RE COMPLAINT

_____/

### CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek M. Maynard)? No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? No

3. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

4. Did this matter involve the participation of or consultation with now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

BY:   /s/ *Corey R. O'Neal*
      COREY R. O'NEAL
      ASSISTANT UNITED STATES ATTORNEY
      Court ID No. A5503031
      500 East Broward Blvd., Suite 700
      Fort Lauderdale, Florida 33394
      Tel: (954) 660-5996
      Email: Corey.O'Neal@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Makram Khashman,<br><br>*Defendant(s)* | )<br>)<br>) Case No. 24-mj-6136-PAB<br>)<br>)<br>) |

FILED BY **SM** D.C.
**Mar 26, 2024**
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **between February and March 25, 2024** in the county of **Broward** in the **Southern** District of **Florida**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958(a) | Murder for hire |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

*Complainant's signature*

Matthew Dayes, ATF
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by **FaceTime**

Date: 3-26-2024

*Judge's signature*

City and state: Fort Lauderdale, Florida   Hon. Panayotta Augistin-Birch, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Matthew Dayes, being duly sworn, depose and state as follows:

### AGENT BACKGROUND AND INTRODUCTION

1. I am currently employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been employed in that capacity for approximately three years. My responsibilities include investigating violations of federal law, including violations of the Gun Control Act (Title 18, United States Code, Chapter 44). Prior to my employment as a Special Agent with ATF, I attended the Federal Law Enforcement Training Center for the Criminal Investigator Training Program as well as Special Agent Basic Training with ATF, where I received extensive training in arson, explosives, firearms, and narcotics related investigations.

2. As an investigative or law enforcement officer, within the meaning of 18 U.S.C. § 2510(7), I am empowered by law to conduct investigations and to make arrests for violations of Title 18 of the United States Code.

### PURPOSE OF THE AFFIDAVIT

3. I submit this Affidavit for the limited purpose of establishing probable cause that Makram KHASHMAN (hereinafter "KHASHMAN") committed murder for hire, in violation of Title 18, United States Code, Section 1958(a).

4. I respectfully submit that there is probable cause to believe that between February 2024 and March 25, 2024, KHASHMAN caused another to travel in interstate or foreign commerce, or used or caused another to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value. As described herein, KHASHMAN paid $2,500 to an ATF

1

undercover agent ("UCA") in exchange for the murder of Victim-1, and promised an additional payment of $2,500 upon completion of the murder.

5. The statements contained in this Affidavit are based on my personal knowledge, as well as information relayed to me by other individuals and law enforcement officers. I have not included in this Affidavit each and every fact known to me. Rather, I have included only the facts that are sufficient to establish probable cause for the issuance of a criminal complaint against KHASHMAN for the above-described criminal violation.

## PROBABLE CAUSE

6. In February of 2024, an ATF confidential informant ("CI") informed law enforcement that KHASHMAN approached the CI to find out if the CI would carry out a murder for KHASHMAN in exchange for payment. The CI declined but told KHASHMAN that he/she knew someone who may be able to assist. The CI then introduced the UCA to KHASHMAN posing as a hitman willing to commit the requested murder.

### February 29, 2024 Meeting

7. On or about February 29, 2024, the UCA and the CI traveled to a meeting arranged with KHASHMAN by phone at a location near 120 S Pine Island Road, Plantation, Florida. The UCA was equipped with an audio/video recording device. At approximately 5:29 p.m., the UCA and CI arrived and waited for KHASHMAN at the agreed upon location.

8. At around 5:44 p.m., the CI called KHASHMAN in the presence of the UCA on telephone number ending in 0251, to tell KHASHMAN he/she was at the meeting location and provided a description of the UCA vehicle. KHASHMAN said he about four minutes away from the meeting location.

9. At approximately 5:54 p.m., law enforcement agents observed a white Chevrolet Suburban SUV bearing Florida license plate number ending in S86 traveling southbound through the parking lot. KHASHMAN called the CI and said he was driving a Suburban. KHASHMAN then parked the Suburban a few spots south of the UCA vehicle.

10. About three minutes later, KHASHMAN walked to the UCA vehicle, opened the rear driver side door, and was told to sit in the front. KHASHMAN walked around the vehicle and was introduced to the UCA by the informant, who moved to the rear passenger seat.

11. KHASHMAN entered the front passenger seat and shook hands with the UCA. KHASHMAN wore a Nike polo shirt bearing the logo "Garden Fresh Produce LLC." The UCA said that he heard KHASHMAN had a problem, to which KHASHMAN replied that it was a big problem. KHASHMAN explained that he was in the streets with his family, that Victim-1 had taken over a million dollars and a business worth three million dollars from KHASHMAN.

12. KHASHMAN then told the UCA "whatever had to be done." After attempting to gain clarification on what that meant, KHASHMAN stated he wanted something easy, like an injection.

13. The UCA directly asked KHASHMAN if he wanted the victim gone, to which KHASHMAN affirmed, and declared he "didn't give a fuck." The UCA advised that once he was committed there was no going back and KHASHMAN answered "no problem" multiple times. The UCA explained to KHASHMAN that he would bring guys down from New York and would need a few days to put eyes on the victim before completing the job.

14. The UCA told KHASHMAN that the price was usually between $5,000 and $10,000 depending on the difficulty of the job. KHASHMAN said he would offer $5,000 because he had already talked to other people who would do it for that price. The UCA agreed and informed

3

KHASHMAN that he would need a photograph, name, address, daily routine, and any additional information related to the Victim-1. KHASHMAN affirmed and emphasized that the Victim-1 had a lot of money on Saturdays because the employees were paid in cash, but the UCA could keep the money.

15. The UCA asked how long until KHASHMAN could provide all the information. KHASHMAN said that Victim-1 had moved and he would need to send someone else to get the address. KHASHMAN said the victim had a big warehouse in Parkland, Florida. The UCA stated he would exchange numbers with KHASHMAN, who agreed to be contacted the following week to meet again and bring the requested information, along with a down payment of $2,500.

16. The UCA told KHASHMAN that he would know KHASHMAN was serious upon bringing the money the following week. When asked if he cared how the crime was committed, KHASHMAN replied "I don't give a fuck." The UCA assured KHASHMAN that once the money and information were received the job would be completed within the week.

17. Prior to exiting the vehicle, the UCA confirmed with KHASHMAN that they would meet the following week and would bring half of the money. KHASHMAN told the UCA that he lost his home and was kicked out by law enforcement. The UCA asked for Victim-1's name but KHASHMAN said it would come later. KHASHMAN then got back into the white Chevy Suburban and exits the parking.

### March 19, 2024 Meeting

18. On or about March 19, 2024, the UCA traveled to a meeting arranged with KHASHMAN by phone regarding an initial payment for a murder for hire near 120 S Pine Island Road, Plantation, Florida. At around 4:06 p.m., the UCA arrived and waited for KHASHMAN. The UCA was equipped with an audio/video recording device.

4

19.     At approximately 4:20 p.m., the UCA observed KHASHMAN arrive to the parking lot driving a white utility van bearing Florida license plate ending in VJR. KHASHMAN parked the van in an adjacent spot, then rolled down the front passenger window and spoke to the UCA. Before KHASHMAN got out of the van, the UCA observed KHASHMAN grabbing a clipboard which concealed what appeared to be folded cash. KHASHMAN also put on a pair of work style gloves.

20.     KHASHMAN then entered the front passenger seat of the UC vehicle, again wearing a polo style shirt with a "Garden Fresh Produce LLC" logo. KHASHMAN said that the information had not been printed out and told the UCA to write the information down, as well as to google the Victim-1's address. KHASHMAN handed the UCA a blue-ink pen, then pulled out folded United States Currency from behind sheets of paper attached to the clipboard. KHASHMAN handed the UCA the clipboard to write down Victim-1's information, and KHASHMAM spelled out the first and last name of the victim.

21.     KHASHMAN said that Victim-1 looked like KHASHMAN and had put on weight because he was a rich man. KHASHMAN told the UCA who else lived with Victim-1, described the cars Victim-1 owned, and warned the UCA that Victim-1's residence may have cameras.

22.     KHASHMAN told the UCA what time the victim departed the residence for work and provided the location and name of Victim-1's business. KHASHMAN told the UCA that Victim-1 would have a large amount of cash on Saturday to pay employees and would be traveling from his residence directly to the business.

23.     KHASHMAN told the UCA that he could wait by the warehouse, describing the area as quiet and unpopulated. The UCA told KHASHMAN that other guys would fly down the following day, and to avoid involving other parties or providing details of the situation.

KHASHMAN agreed and explained essentially that he took the money to pay for the hit slowly over time to avoid detection.

24. The UCA told KHASHMAN that once the money was provided, there was no going back, which KHASHMAN affirmed and placed the folded cash on the center console for the UCA. The UCA told KHASHMAN that he wanted to be clear that KHASHMAN wanted the victim dead to which KHASHMAN replied "no shit." KHASHMAN said that Victim-1 ruined his life and that he was willing to "do it myself" and "didn't give a fuck."

25. The UCA told KHASHMAN that "on the day it happens," the UCA would contact him for the last time. KHASHMAN then ripped off the portion of paper used to write down Victim-1's information and handed it to the UCA. KHASHMAN reiterated that the warehouse location was a large area with nobody around and advised to do it quiet and calm.

26. KHASHMAN and the UCA discussed a final meeting when the job was done, when the final payment would be due and the UCA would be provide photographic proof of the crime. Before KHASHMAN got out of the vehicle, the UCA asked again if KHASHMAN was sure about the request to which he told the UCA to stop asking questions and that he was good.

27. KHASHMAN the exited the UC vehicle and walked toward the van and left the area. The UCA then returned to a pre-determined location to meet other law enforcement and transferred custody of the $2,500, the blue-ink pen, and the ripped portion of paper bearing Victim-1's information to your Affiant.

## CONCLUSION

28. Based on the information contained herein, I respectfully submit that there is probable cause that Makram KHASHMAN committed murder for hire, in violation of Title 18, United States Code, Section 1958(a).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Respectfully submitted,

_____
Matthew Dayes, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by FaceTime on this __26th__ day of March, 2024.

_____
HONORABLE PANAYOTTA AUGUSTIN BIRCH
UNITED STATES MAGISTRATE JUDGE

7

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 24-mj-6136-PAB

### BOND RECOMMENDATION

DEFENDANT: Makram Khashman

Pre-Trial Detention is recommended

(Personal Surety) (Corporate Surety) (Cash) **(Pretrial Detention)**

/s/ Corey R. O'Neal

AUSA: Corey O'Neal

Last Known Address: 4 Elton Pl.

Boynton Beach, Florida 33426

What Facility:

Agent(s): Matthew Dayes ATF

(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)

Bureau of Alcohol, Tobacco, Firearms and Explosives